**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NURIYE UYGUR** | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | **No. 24-975** |
| **GARY GENSLER**, in his official capacity as | : | |
| CHAIRMAN, U.S. SECURITIES AND | : | |
| EXCHANGE COMMISSION | : | |

**McHUGH, J.**                                                                                    **July 19, 2024**

### MEMORANDUM

This is an employment case brought by a longtime government attorney against the U.S. Securities and Exchange Commission (SEC).   Plaintiff brings a single claim under the Rehabilitation Act, contending that the agency retaliated and discriminated against her for her disabilities by denying requests for certain in-person training.  The SEC moves to dismiss. Upon review, I agree that the Complaint fails to state a claim under any theory of liability, including a failure to accommodate, and will therefore dismiss the action but grant leave to amend.

### I.       Facts as Pleaded

Plaintiff Nuriye Uygur is an accomplished attorney who joined the SEC's Philadelphia office in 2005.  Compl. ¶¶ 14-19.  At some point during her employment, Uygur was diagnosed with dyslexia and attention deficit hyperactivity disorder (ADHD), which impacts her concentration and ability to read and write.  *Id.* ¶¶ 3-4.  Sometime after this diagnosis, the SEC provided Uygur with three computer training programs "as an accommodation for [her] disabilities."  *Id.* ¶ 33.  The programs were Kruzweil 3000, Inspiration, and Read&Write Gold.[1]

---

[1] The Complaint refers to this program as "Read, Write & Gold," but this appears to be inaccurate based on a cursory internet search.  Compl. ¶ 33.

The Complaint alleges that Michele Englar – the Human Resources "Disability Program Officer" – was tasked with helping Uygur install the computer programs and facilitate training on how to use them. *Id.* ¶¶ 34-35. On January 8, 2016, Uygur emailed Englar:

> I spoke to [a representative] from Kruzweil 3000 today. He asked me to notify him when the software is installed and he offered to set up training after January 18, 2016. Please let me know if the budget permits in-person training. It looks like Kurzweil 3000 trainer is in Bethesda, Maryland, which is about an hour and a half away from Philadelphia by train.

*Id.* ¶ 37. Englar allegedly "responded to the [] email but ignored [Uygur's] request for in-person training." *Id.* ¶ 38. The Complaint offers no further information about Englar's response.

About seven weeks later, on February 24, Uygur claims she sent a second email to Englar regarding in-person training: "I am following up on a January 8, 2016 request inquiring whether the budget permits live training." *Id.* ¶ 50. There is no indication of how Englar responded to this message, if at all.

The next relevant allegation is that on or about March 4, the Director of the Human Resources "denied the request for live training for the three (3) computer programs without engaging in the interactive process for evaluating disability accommodation requests." *Id.* ¶ 54. Notably, the Complaint never recounts if or when Uygur requested in-person training for Read&Write Gold or Inspiration.[2]

The Complaint goes on to allege that (1) the Philadelphia office "is equipped with a training room to conduct computer-based trainings," which had been used before to host live training

---

[2] The Complaint only offers that "Plaintiff emailed Englar, stating, 'I am scheduled to train with Kimberly Nix on February 16, 2016 from 9-11 a.m. . . . I have not been contacted by anyone about [Inspiration] training. Let me know if you want me to reach out to someone directly at Inspiration." *Id.* ¶ 40. The Complaint then clarifies that Kimberly Nix was a trainer for Read&Write Gold, and that the February 16 training took place "via video conference." Compl. ¶ 47. At this training, Nix allegedly told Uygur that in-person training for Read&Write Gold would cost only $500, "includ[ing] travel expenses," *id.* ¶ 49, but there is no allegation that Uygur requested in-person training for this program or conveyed the quoted cost to anyone at the SEC. Nor does the Complaint state where or for how long the training would have been.

sessions,[3] (2) Uygur was once told that the SEC's budget for disability programs was "extensive," and (3) Uygur had prior "documented difficulties" using the SEC's WebEx platform for virtual training.  *Id.* ¶¶ 51-53, 57, 61.

Uygur also details a separate exchange between herself and her supervisor, which took place in the time between her two emails to Englar.  The exchange regarded a two-day conference in Washington, D.C.  Uygur sought to attend the conference in-person, but her supervisor allegedly denied her requests on the basis that all Philadelphia-based employees would participate virtually. *Id.* ¶¶ 41-43.  Uygur eventually supplied a letter from her physician, explaining "why the live, in-person format was needed in order to address her disabilities."  *Id.* ¶ 44.  And upon receipt of this letter, the Human Resources office finally approved her to attend the conference in-person.  *Id.* ¶ 45.  Uygur suggests that her physician's letter should have been deemed applicable to her request for in-person computer program training as well, but she claims the Human Resources Director refused to consider the physician's guidance beyond the D.C. conference.  *Id.* ¶¶ 46, 56, 59-60.

It appears that Uygur remains employed by the SEC, *id.* ¶ 5, but she claims the interactions described above caused her to incur unspecified losses in her earnings or earning capacity, losses in benefits, pain and suffering, embarrassment, and additional past and future harms.  *Id.* ¶¶ 70-71.  In July, 2016, she filed a formal complaint with the SEC's Office of Equal Employment Opportunity for disability discrimination.  *Id.* ¶ 10.  After several amendments to that complaint and more than seven years, Uygur was granted a right to file a civil action against the SEC.  *Id.* ¶ 11-12.  She commenced this action in March, 2024, alleging one count of a Rehabilitation Act violation.  ECF 1.

---

[3] This would seem to imply that Uygur specifically sought in-person training to be held in the office, but the only request Uygur recites in the Complaint was to travel elsewhere for in-person training.  *See* Compl. ¶¶ 37, 50.

II.     **Legal Standard**

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

III.    **Discussion**

Uygur claims the SEC violated the Rehabilitation Act by discriminating and retaliating against her for her disability.  She premises both theories of liability on an alleged failure to accommodate her.  Compl. ¶ 73 ("By committing the foregoing acts of discrimination and retaliation against Plaintiff, including by failing to provide her with reasonable accommodations, Defendant has violated the Rehabilitation Act.").  She also claims retaliation based on a complaint she made to SEC management prior to the accommodation requests at issue here.  I conclude that the Complaint fails to allege either discrimination or retaliation under the Rehabilitation Act.

**A.  Discrimination**

To state a claim for discrimination under the Rehabilitation Act, a plaintiff must allege that they were disabled, that they were qualified for the job, and that they suffered discrimination because of their disability.[4]  *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021); 29 U.S.C. § 701, *et seq.*  Uygur's discrimination claim is based solely on the SEC's alleged failure to accommodate her disability as she requested.  To establish a failure to accommodate, a plaintiff must show that (1) she was disabled and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated.  *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (citation and quotations omitted); *Robinson v. First State Cmty. Action Agency*, 920

---

[4] There is no dispute that Uygur has alleged a disability and that she was qualified for her job.

F.3d 182, 188 n.30 (3d Cir. 2019); *see also Fowler*, 578 F.3d at 208 (acknowledging "coextensive" standards under the ADA and Rehabilitation Act).

The only issue here is whether the Complaint sufficiently alleges a lack of good faith effort to provide Uygur with a reasonable accommodation.   A reasonable accommodation is a modification or adjustment to the work environment that enables an individual with a disability – who is qualified to perform the essential functions of their position – to equally enjoy the benefits and privileges of employment.   29 C.F.R. § 1630.2(o)(1).   "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]."  29 C.F.R. § 1630.2(o)(3).  But "[t]he interactive process does not dictate that any particular concession must be made by the employer . . . . All the interactive process requires is that employers make a good-faith effort to seek accommodations." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999) (citation omitted).

The SEC argues that the Complaint fails to allege a lack of good faith to accommodate Uygur because, based upon Uygur's own allegations, "the SEC *did* accommodate her."  Mot. at 5. The agency contends it did so by allowing Uygur to attend the D.C. conference in-person, by providing her with three assistive computer programs, and by facilitating training on those programs, "albeit virtually as opposed to in person."  Mot. at 6.  It points to *Ansonia Board of Education v. Philbrook*, where the Supreme Court held in the context of a religious discrimination claim under Title VII that "any reasonable accommodation by the employer is sufficient to meet its accommodation obligation," even if the employee would prefer a different accommodation. 479 U.S. 60, 68 (1986).

The agency's characterization of the Complaint is accurate.  The facts pleaded do not plausibly set forth a failure to accommodate, or a lack of good faith on the part of the agency.

Uygur was permitted to attend the D.C. conference in-person, and despite a reference to past WebEx difficulties, the Complaint provides no detail on whether, or how, Uygur was left unable to enjoy the equal benefits and privileges of employment by receiving virtual rather than in-person training on the three assistive computer programs provided to her as an accommodation.  *See* 29 C.F.R. § 1630.2(o)(1)(iii).  Nor does the Complaint allege with any specificity how Uygur's ability to work, or her status at the SEC, were negatively affected by a lack of in-person training on these programs.  Further, the Complaint fails to allege how the physician's letter focusing on a two-day conference in D.C. would pertain to her separate inquiry, to a different individual, about "whether the budget permit[ed] live training" for the Kurzweil 3000 computer program.  Ms. Uygur was provided every accommodation she requested except for her preferred method of training on the assistive programs offered for her use.  I conclude that Uygur has not sufficiently alleged a failure to accommodate that would support her discrimination claim.[5]

### B.  Retaliation

To establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff bears the burden of showing that: (1) she engaged in protected conduct; (2) the employer took an adverse action against her contemporaneous with or after she engaged in the protected conduct; and (3) there was a causal connection between the protected activity and the adverse action.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *see also Boandl v. Geithner*, 752 F. Supp. 2d 540, 561 (E.D. Pa. 2010) ("Just as the Rehabilitation Act borrows the ADA's standards for accommodation claims, it borrows as well the ADA framework for retaliation claims.").

---

[5] The Complaint also includes a vague reference to "subsequent requests by Plaintiff for live, in-person trainings at the SEC, [which] Defendant [] continued in failing to provide."  Compl. ¶ 62.  This allegation lacks sufficient detail to plausibly support Uygur's claim.

Uygur alleges that in 2015, "pursuant to the SEC's anti-harassment policy, [she] complained of discrimination" to the Associate and Regional Directors of the Philadelphia office. Compl. ¶¶ 24-25.  Notwithstanding the vagueness of this allegation, "[t]he SEC concedes that Uygur engaged in protected activity by requesting accommodations for her disability" in 2016. Mot. at 10.

Nonetheless, the Complaint does not sufficiently allege an adverse action as a result of any protected activity.  As explained above, the Complaint does not establish a failure to accommodate, and even if it did, Uygur does not specify any kind of demotion, mistreatment, or negative change in her employment after she made her requests.  And courts in this Circuit have repeatedly held that a failure to accommodate cannot simply be reformulated as an adverse action to support a retaliation claim.  *See, e.g.*, *Barnard v. Lackawanna Cnty.*, No. 17-66, 2017 WL 4233030 (M.D. Pa. Sept. 25, 2017) ("[A] failure to accommodate theory . . . cannot be characterized as a retaliation claim under the ADA.  The claim is a direct discrimination claim based on alleged failures to fulfill the affirmative duties prescribed by the ADA, not a claim based on alleged actions prohibited by the ADA." (quoting *Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 783 (E.D. Pa. 2012))); *Garner v. Sch. Dist. of Phila.*, 63 F. Supp. 3d 483, 500 (E.D. Pa. 2014) (dismissing a retaliation claim where the plaintiff's claim was "nothing more than a repackaged statement of his underlying claims that [his employer] failed to reasonably accommodate his disability.").  The Complaint therefore does not support a retaliation claim under the Rehabilitation Act.

## IV.    Conclusion

For the reasons set forth, Defendant's motion to dismiss will be granted and this case will be dismissed.  I am obligated to dismiss without prejudice and with leave to amend, but Plaintiff

is reminded that any amendment must have a good faith basis on which Plaintiff can proceed.  An

appropriate order follows.

<u>/s/ Gerald Austin McHugh</u>
United States District Judge